UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CLARENCE BROTHERS,

      Plaintiff,

vs.                                 Case No.  6:11-cv-830-Orl-MCR

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.
_____

## MEMORANDUM OPINION AND ORDER[1]

This cause is before the Court on Plaintiff's appeal of an administrative decision denying his application for Supplemental Security Income.  The Court has reviewed the record, the briefs, and the applicable law.  For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.

## I.   PROCEDURAL HISTORY

Plaintiff protectively filed an application for Supplemental Security Income ("SSI") on June 16, 2003, alleging an inability to work since March 15, 2003.  (Tr. 79-81).  The Social Security Administration ("SSA") denied Plaintiff's application initially on September 11, 2003, and again upon reconsideration on February 13, 2004.  (Tr. 52-55, 57-60).  On March 9, 2004, Plaintiff requested a hearing before an Administrative Law Judge (the "ALJ") and his case was heard on May 3, 2007.  (Tr. 61, 308-323).  On June 18, 2007, the ALJ issued a decision finding Plaintiff not disabled.  (Tr. 14-23).  Plaintiff filed a Request for Review by the

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Doc. 15).

Appeals Council, which was denied on January 4, 2008.  (Tr. 6-11, 340-342).

On September 5, 2008, the Appeals Council granted Plaintiff's request for an extension of time to file a civil action.  (Tr. 5).  Plaintiff filed a Complaint in the U.S. District Court on October 6, 2008.  (Case Number 5:08-CV-427-Oc-GRJ).  Subsequently, the Commissioner moved for a remand of Plaintiff's case.  (Tr. 355-356).  The District Court entered a judgment granting the Commissioner's motion on June 29, 2009.  (Tr. 351).  The Court's remand Order directed the ALJ to hold a hearing and provide Plaintiff the opportunity to submit additional medical records, consider the medical opinion of Dr. Radin, and re-evaluate the evidence as a whole to consider whether Plaintiff had a severe mental impairment.  (Tr. 353-354).  The ALJ held a supplemental hearing on December 6, 2010 (Tr. 447-460) and issued a decision finding Plaintiff not disabled on January 3, 2011.  (Tr. 328-339).  On March 29, 2011, the Appeals Council denied Plaintiff's request for review.  (Tr. 324-326).  Accordingly, the ALJ's January 3, 2011 decision is the final decision of the Commissioner.  Plaintiff timely filed a Complaint in the U.S. District Court on May 18, 2011. (Doc. 1).

## II.    NATURE OF DISABILITY CLAIM

### A.    <u>Basis of Claimed Disability</u>

Plaintiff claims to be disabled since March 15, 2003, due to hypertension, enlarged heart, fatigue, and nerve damage in the neck and shoulder area.  (Tr. 79-81, 144).

### B.    <u>Summary of Evidence Before the ALJ</u>

Plaintiff was born on April 17, 1963 and was forty-seven years of age on the date of the ALJ's decision.  (Tr. 79, 339).  He attended school through the eleventh grade and has

past relevant work experience as a cook, dishwasher, laborer in a metal processing facility, and production worker in a warehouse.  (Tr. 145, 150-155).  The following provides a brief summary of Plaintiff's medical history.  Because Plaintiff's appeal concerns his left arm impairments and mental impairments, the Court will confine its discussion to records concerning those conditions.

On November 11, 1996, Plaintiff was involuntarily admitted to Circles of Care, Inc. due to depression and suicidal thoughts.  (Tr. 179-186).  During that visit, Plaintiff's urine toxicology tested positive for cocaine use and Plaintiff admitted to a four to five year history of abusing the drug.  (Tr. 179).  Plaintiff was examined by Dr. Mosher, who noted Plaintiff exhibited no evidence of any psychotic symptamology or suicidal ideation, but only wanted treatment for his addiction.  Id.  Dr. Mosher informed Plaintiff of an open bed at Twin Rivers Detoxification Unit.  Id.  Plaintiff was voluntarily discharged for admission to that unit and advised to follow their recommendations and seek their assistance in being discharged to a half-way house.  Id.  Plaintiff was diagnosed with a Depressive Disorder Not Otherwise Specified and assessed a GAF score of 50.  (Tr. 180).

On December 18, 1997, Plaintiff was referred to Dr. Nitin Hate for examination in response to a previous disability claim.  (Tr. 189-191).  Dr. Hate noted Plaintiff sustained a knife injury to his left arm in 1992, which required surgical intervention.  (Tr. 189).  Dr. Hate indicated the injury had resulted in nerve damage and atrophy of Plaintiff's left biceps along with numbness and weakness below the site of injury.  Id.  Dr. Hate also indicated the injury would limit Plaintiff's ability to lift with his left arm, particularly through the elbow.  (Tr. 191).  It was further noted that Plaintiff suffered from left knee internal derangement with effusion, which caused a severe limp.  Id.  Dr. Hate stated Plaintiff's knee impairments would likely

3

require surgical treatment and Plaintiff's ability to work would depend on the success of that treatment.  Id.

On December 30, 1997, a state agency medical expert administered a Residual Functional Capacity ("RFC") assessment.  (Tr. 192-199).  The medical expert noted Plaintiff's history of stab wound and resulting weakness of Plaintiff's left upper extremity.  (Tr. 93).  The assessment found Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and was not able push or pull with his left arm.  Id.  The document further provided that Plaintiff was limited in his ability to reach in different directions, handle (gross manipulation), finger (fine manipulation), and feel with his left arm.  (Tr. 195).  The assessment limited Plaintiff to light exertion not requiring the use of his left upper extremity.  (Tr. 193).

On March 3, 1998, Plaintiff underwent another RFC assessment.  This assessment agreed with the previous that Plaintiff was able to lift twenty pounds occasionally, lift ten pounds frequently, and was limited in his ability to reach overhead.  However, this assessment indicated Plaintiff could frequently push or pull with his left arm and was not limited in his capacity for handling, fingering, or feeling in that arm.  (Tr. 111,113).  The state agency medical expert also found Plaintiff was capable of performing light work.  (Tr. 115).

On March 20, 2000, Plaintiff was referred to Dr. Jack Bergstresser.  (Tr. 226).  Plaintiff's ability to raise and lower his left arm was recorded at 4/5 and his grip strength was recorded as 5/5 in both arms.  (Tr. 227).  Dr. Bergstresser further noted Plaintiff was well oriented to time and place, had a normal affect and demeanor, and related well to his staff.  (Tr. 227).  Overall, Dr. Bergstresser found Plaintiff was mildly impaired from using flexion in his left arm and did not identify any mental impairments.  (Tr. 227-228).

4

On March 30, 2000, Plaintiff underwent a third RFC assessment.  This assessment agreed with the previous two that Plaintiff was able to lift twenty pounds occasionally and ten pounds frequently.  (Tr. 133).  The assessment also found Plaintiff was unlimited in his ability to push or pull with either arm and had no established limitations in reaching, handling, fingering, feeling, or any other manipulative limitations.  (Tr. 135).

On March 14, 2002, Plaintiff was admitted to the Community Medical Clinic in Titusville, Florida for a physical examination.  (Tr. 234-237).  Plaintiff complained of left cervical neck pain radiating to his left thoracic back area.  Id.  Plaintiff described the pain as intermittent and rated it at an eight out of ten.  Id.  During examination, Plaintiff's grip strength was assessed at one or two out of five in his left hand and five out of five in the right.  (Tr. 236).  The examination also noted Plaintiff had decreased strength with abduction against resistance in the left arm.  Id.  Plaintiff exhibited a full bilateral range of motion.  Id.  Plaintiff returned to the Community Medical Clinic on May 30, 2002, June 10, 2002, and August 5, 2002.  (Tr. 229-233).  The June 10 evaluation indicated Plaintiff exhibited a full range of motion in his extremities and equal strength bilaterally.  (Tr. 231).  During his last visit, Plaintiff's grip strength was assessed at four out of five in his left arm and five out of five in his right.  Id.

On February 5, 2004, Plaintiff was evaluated by Dr. Radin, a psychiatrist from Circles of Care, Inc.  (Tr. 67-68).  Plaintiff reported feeling depressed with suicidal thoughts, experiencing mood swings, feeling worthless, and a sense of not being well.  (Tr. 68).  Dr. Radin noted Plaintiff was courteous and cooperative, but also hypervigilant and suspicious.  Id.  Dr. Radin also found Plaintiff had no difficulties with his memory and was oriented to time, place, and person.  Id.  Plaintiff's thought flow did not include paranoia, delusions, or

hallucinations.  Id.  Although Plaintiff was not suicidal at the time of evaluation, Plaintiff's

mood was described as dysthymic with a depressed affect.  Id.  Dr. Radin indicated

Plaintiff's motivation for treatment was questionable and he exhibited suspicious, evasive,

and avoidant traits.  Id.  However, Dr. Radin found Plaintiff's insight and judgment were fair,

his intelligence was average, and he was able to give informed consent for needed care.

(Tr. 67-68).  Plaintiff's was diagnosed with a depressive disorder not otherwise specified and

assessed a GAF score of 50.  (Tr. 67).

On February 11, 2010, Plaintiff was referred to Thomas Guidera, Ph.D. for a

psychological evaluation.  (Tr. 428-430).  Dr. Guidera observed that Plaintiff was

accompanied during this visit by his partner, Patricia Daniels.  Ms. Daniels conveyed to Dr.

Guidera that Plaintiff acted frightened or depressed at times and avoided going outside.  (Tr.

428).  Dr. Guidera noted Plaintiff would not sit in the room with the evaluator alone, was

shaking while in the waiting room, and stated he did not want to go into the office.  Id.  Dr.

Guidera also indicated rapport with the Plaintiff was strained and Plaintiff left with a sense of

urgency at the end of the consultation without waiting for Ms. Daniels.  (Tr. 429).  Plaintiff

was described as polite, appropriately dressed, appropriately groomed, highly motivated to

attain work, and concerned about his financial situation.  (Tr. 428, 430).  Dr. Guidera

indicated Plaintiff had a good long-term memory and an average short-term memory.  (Tr.

428).  Also, Plaintiff was oriented to time, place, and person.  Id.  However, Dr. Guidera

found Plaintiff appeared to suffer from an active thought disorder.  Id.  He noted Plaintiff

reported being suspicious of others, appeared to have trouble with delusional beliefs,

displayed hypervigilance, expressed a reluctance to be near other people, experienced

feelings of paranoia, and experienced feelings of wanting to escape or avoid.  Id.  Plaintiff

6

was diagnosed with a Depressive Disorder Not Otherwise Specified and assessed a GAF score of 60-70.  (Tr. 429).

On April 23, 2010, Plaintiff' underwent another mental status examination; this time by Dr. David Greenblum.  (Tr. 431-434).  Plaintiff reported feelings of hopelessness, suicidal ideation without planning, depressed mood, lack of energy, and anxiety.  (Tr. 431).  In addition to these complaints, Plaintiff exhibited reduced psychomotor activity and constricted affect.  (Tr. 433).  Dr. Greenblum noted Plaintiff was not hallucinating, not delusional, and his speech was relevant.  Id.  Further, Plaintiff could remember four of four words immediately and two of four words after two minutes; could spell the word "world" forward and backward; knew how many nickels were in a dollar, but did not know how many were in a dollar and thirty-five cents; knew who the vice president of the United States was; knew the similarities between a chair and a desk, but not between a horse and a dog nor between an orange and a banana; and could not state the meaning of a proverb.  Id.  Plaintiff was diagnosed with a dysthymic disorder and antisocial personality disorder.  (Tr. 433-434).  Plaintiff was assessed a GAF score of 55, consistent with moderate difficulty in social and occupational functioning.  (Tr. 434).

On April 26, 2010, Plaintiff underwent an MRI of his left shoulder.  (TR. 414-415).  The MRI indicated no visible rotator cuff tear, but showed acromioclavicular joint hypertrophy and type two acromion.  (Tr. 414).  Dr. Hanna, administered an injection of Depo-medrol and Marcaine into Plaintiff's left shoulder to relieve his symptoms.  (Tr. 405).  In a follow up appointment on June 1, 2010, Plaintiff reported partial relief and other treatment options were discussed.  (Tr. 403).  Dr. Hanna administered an arthroscopy of Plaintiff's left shoulder in August of 2010.  (Tr. 402).

7

Plaintiff attended physical therapy after his left arm arthroscopy.  A Physical Occupational Therapy Evaluation dated August 20, 2010 stated Plaintiff was unable to carry a garbage can, lift a garbage can lid, pour a gallon of milk, or reach over shoulder height with his left arm prior to therapy.  (Tr. 440).  The Plaintiff's Plan of Care indicated four weeks of therapy was expected to increase Plaintiff's range of motion to enable him to reach overhead without limitation and increase his left arm strength to enable him to lift twenty pounds with his left arm.  (Tr. 438).  The Plan referred to participation in production line work along with these goals and indicated Plaintiff had good "Rehab Potential."  Id.  A post operative examination conducted on September 8, 2010, showed Plaintiff's left arm wounds were well healed with no swelling or tenderness present.  (Tr. 401)  Plaintiff reported improvement in his left shoulder pain, range of motion, and strength.  Id.  Examination revealed a full active and passive range of motion in Plaintiff's left shoulder.  Id.

## C.    Summary of the ALJ's Decision

A claimant is entitled to disability benefits when he is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months.  42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 416.905.  The ALJ must follow a five step sequential evaluation in determining whether a claimant applying for supplemental security income is disabled.  See 20 C.F.R. § 416.920.  First, if a claimant is working at a substantial gainful activity, he is not disabled.  20 C.F.R. § 416.920(a)(4)(i).  Second, if a claimant does not have any impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities for at least twelve months, then he does not have a severe impairment and is not disabled.  20 C.F.R.

8

§ 416.920(a)(4)(ii).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.  20 C.F.R. § 416.920(a)(4)(iii). Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.  20 C.F.R. § 416(a)(4)(iv).  Fifth, if a claimant's impairments (considering his RFC, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.  20 C.F.R. § 404.1520(a)(4)(v).  The plaintiff bears the burden of persuasion through step four, but the burden shifts to the Commissioner at step five.  Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287 n.5 (1987).

In the instant case, the ALJ found Plaintiff satisfied the first step and had not engaged in substantial gainful activity since his alleged onset date of March 15, 2003.  (Tr. 333).  At step two, the ALJ found Plaintiff's history of scoliosis, history of left arm/shoulder stab wound and tendonitis, history of left knee internal derangement and effusion, history of cardiomyopathy and hypertension, mild obesity, and depressive disorder with anxiety constituted severe impairments.  Id.  At step three, the ALJ found Plaintiff did not have an impairment which met or equaled one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Tr. 334).

The ALJ determined Plaintiff retained an RFC sufficient to perform light work as defined in 20 C.F.R. § 416.967(b), but only of a non-stressful nature.  (Tr. 335).  At step four, the ALJ found Plaintiff was unable to perform past relevant work.  (Tr. 338).  At step five, the ALJ relied on the medical-vocational guidelines (the "grids") and found Plaintiff was able to perform a significant number of jobs in the national economy based on his age, education, work experience, and RFC.  Consequently, the ALJ found Plaintiff was not disabled.  (Tr. 339).

III.    **ANALYSIS**

A.    **The Standard of Review**

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence. Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002); Lewis v. Callahan, 125 F.3d 1436, 1439 (1997).  Substantial evidence is more than a scintilla but less than a preponderance, Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005), and includes relevant evidence which a reasonable person would accept as adequate to support the conclusion.  Crawford v. Commissioner of Social Sec., 363 F.3d 1155, 1158 (11th Cir. 2004).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g). The district court will affirm a decision by the Commissioner supported by substantial evidence even if the court finds the evidence preponderates against the decision and even if the court would have reached a different conclusion as finder of fact.  Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Foote v. Chater, 67 F.3d 1553 at 1560 (11th Cir. 1995).

B.    **Issues on Appeal**

Plaintiff raises three issues on appeal.  (Doc. 22, pp. 12-22).  First, Plaintiff argues the ALJ erred by failing to comply with the Court's June 26, 2009 remand Order.  (Doc. 22, pp. 12-18).  Second, Plaintiff argues the ALJ erred in failing to assign any arm limitations to Plaintiff.  (Doc. 22, pp. 18-19).  Finally, Plaintiff argues the ALJ improperly relied on the grids

in determining he was not disabled.  (Doc. 22, pp. 19-22).  The Court will address each of these claims.

### 1.    Whether the ALJ complied with the remand orders

Plaintiff argues the ALJ failed to comply with the remand orders from the District Court and Appeals Council.  (Doc. 22, pp. 12-18).  Specifically, Plaintiff asserts the ALJ failed to properly consider Dr. Radin's evaluation in determining whether he had a severe mental impairment.  (Doc. 22, p. 12).  Plaintiff asserts the ALJ erred by rejecting Dr. Radin's opinion and failing to provide reasons for doing so.  (Doc. 22, p. 13).  Plaintiff also asserts the ALJ erred in finding Plaintiff's depressive disorder posed only mild functional limitations. Id.  After considering both of these claims and the applicable law, the Court finds the ALJ did not fail to comply with the remand orders of the District Court and Appeals Council.

Plaintiff first argues the ALJ failed to properly address the psychological evaluation conducted by Dr. Radin on February 5, 2004.  (Doc. 22, p. 13).  Plaintiff asserts the ALJ was required to state with particularity the weight given to the evaluation and the reasons for giving that weight.  Id.  Plaintiff further contends the ALJ rejected Dr. Radin's medical opinion in rendering his decision and failed to provide reasons for doing so.  Id.  In particular, Plaintiff points to his GAF score of 50, which indicates the presence of serious symptoms.  (Doc. 22, p. 16; Doc 25-1, p. 3).  Plaintiff argues this score is inconsistent with the ALJ's finding that his mental impairments posed only mild limitations on his ability to perform basic work functions.  Id.  The Commissioner responds by arguing the ALJ properly considered Dr. Radin's evaluation as evidenced by his discussion of the document in his decision.  (Doc. 23, p. 9).  The Commissioner further argues that GAF scores merit little deference in determining whether a claimant is disabled as they are merely a snapshot

opinion regarding an individual's mental impairments.  (Doc. 23, p. 13).

The ALJ is required to consider all evidence of record in making a disability determination.  20 C.F.R. § 416.920.  However, the ALJ is not required to discuss all of the evidence presented in rendering his decision.  Rather, the ALJ must discuss why he rejected any significant probative evidence.  Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984); Watkins v. Commissioner of Social Sec., 457 F. App'x 868, 871 (11th Cir. 2012).  The Commissioner must indicate the legal rules applied in considering such evidence and the weight given to it.  Ryan v. Heckler, 762 F.2d 939, 941 (11th Cir. 1985).  The Court cannot ensure a limited and meaningful review "if the ALJ does not state with sufficient clarity the rules being applied and the weight accorded the evidence considered."  Id.  Without any discussion, it is impossible for a reviewing court to determine whether the ALJ's decision is rational and supported by substantial evidence.  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).

The Court finds there is sufficient evidence to indicate the ALJ properly considered Dr. Radin's evaluation.  The ALJ acknowledged the evaluation in his decision and summarized the findings therein.  (Tr. 337).  Specifically, the ALJ noted Dr. Radin found Plaintiff courteous, cooperative, appropriate, and intelligent enough to give informed consent for treatment.  (Tr. 337).  The ALJ also provided that Dr. Radin found Plaintiff's memory was okay and he was oriented to time, place, and person.  Id.  Further, the ALJ noted the evaluation indicated Plaintiff exhibited a depressed affect following a dysthymic mood and a questionable motivation for treatment.  Id.  Finally, the ALJ acknowledged Dr. Radin's finding that Plaintiff was intelligent enough to cooperate with needed care, but was cautious about accepting medication.  Id.  Accordingly, the undersigned finds this discussion

indicates the ALJ did not fail to consider Dr. Radin's opinion in rendering his decision.

Although the ALJ did not indicate the weight given to Dr. Radin's evaluation, the Court finds this was not reversible error because the document does not constitute significant probative evidence.  In considering the contents of the evaluation, certain findings can be quickly dismissed as having little or no probative value.  For example, Dr. Radin's indications that Plaintiff was courteous, cooperative, appropriate, and intelligent enough to give informed consent for treatment and cooperate with needed care fall within this category.  Also included in this category are the findings that Plaintiff was well oriented to time, place, and person.  However, certain findings in the evaluation cannot be so quickly characterized.  For example, the evaluation indicated Plaintiff reported being depressed and having some suicidal thoughts in the past without serious intent, reported having a sense of worthlessness and not being well, exhibited a depressed affect following a dysthymic mood, was "a little bit hypervigilant and suspicious," exhibited evasive and avoidant traits, showed questionable motivation for treatment, and was diagnosed with a Depressive Disorder Not Otherwise Specified.  However, these findings are not inconsistent with the ALJ's conclusion that Plaintiff suffered from a depressive disorder with anxiety which posed mild functional limitations and the ALJ did not clearly reject these findings in rendering his decision.  The finding which appears to offer the most probative value is Plaintiff's GAF score of 50, which indicates the presence of serious symptoms.  Because Plaintiff's low GAF score does appear inconsistent with the ALJ's conclusion that Plaintiff suffered only mild functional limitations, the Court considers it further below.

The Commissioner is correct in noting that courts give only limited weight to a claimant's GAF score in determining whether he is disabled.  See Gasaway v. Astrue, No.

8:06-cv-1869-T-TGW, 2008 WL 585113 at *4 (M.D. Fla. Mar. 3, 2008) (stating "reliance on a GAF score is of questionable value in determining an individual's mental functional capacity").  The Eleventh Circuit has found that a reversal for further consideration of a claimant's GAF score was merited in some cases.  However, those cases involved a misinterpretation of the score at the administrative level.  See McCloud v.  Barnhart, 166 F. App'x 410 (11th Cir. 2006); Davis v. Astrue, 287 F. App'x 748 (11th Cir. 2008).  In the absence of such a misinterpretation, courts have generally found that an ALJ's failure to discuss a claimant's GAF score is not reversible error.  See Baily v. Astrue, No. 3:09-cv-383-J-JRK, 2010 WL 3220302 at *8-9 (M.D. Fla. Aug. 13, 2010) (finding an ALJ's failure to discuss the claimant's GAF score did not require reversal under McCloud); Bruner v. Commissioner of Social Sec., No. 8:08-cv-1744-T-27GJK, 2009 WL 3052291 at *2 (M.D. Fla. Sept. 23, 2009) (finding an ALJ's failure to mention or weigh the claimant's GAF score does not show the ALJ failed to consider all medical evidence); DeBoard v. Commissioner of Social Sec., 211 F. App'x 411, 416 (6th Cir. 2006) (finding references to the opinions and diagnoses of medical sources indicated an ALJ considered them in assessing the claimant's impairments and a failure to reference the claimant's GAF scores or compare different scores attributed to the claimant, without more, did not require reversal).  Accordingly, the Court finds the ALJ did not commit reversible error in failing to discuss Plaintiff's low GAF score in Dr. Radin's evaluation.  Because the evaluation did not otherwise indicate inconsistency with the ALJ's decision, the Court finds it does not constitute significant probative evidence and the ALJ was not required to discuss the rules applied or weight given to the evaluation in considering it.

Plaintiff also argues the ALJ erred in reaching contradictory findings regarding the

14

severity of his mental impairment. (Doc. 22, p. 13). Specifically, Plaintiff asserts the finding that his depressive disorder posed little or no limitation on the functional areas provided by 20 C.F.R. § 416.920a(c)(3) was contrary to the finding that his depressive disorder was severe. (Doc. 22, p.14). Plaintiff contends such contradictory findings cannot be supported by substantial evidence. (Doc. 22, p. 14-15). The Commissioner responds by arguing that there is no contradiction inherent in finding Plaintiff's impairments are severe yet pose only mild functional limitations. (Doc. 23, pp. 10-11). The Commissioner further asserts that the ALJ's findings regarding the severity of Plaintiff's mental impairments are supported by substantial evidence. Id.

When a claimant presents a colorable claim of mental impairment, the ALJ must complete a Psychiatric Review Technique Form, or incorporate the form's mode of analysis into his decision. Moore v. Barnhart, 405 F.3d 1208, 1214 (11th Cir. 2005). This mode of analysis includes an evaluation of how a claimant's mental impairments impact four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. 416.920(a)(c)(3). The first three functional areas are rated on the following scale: none, mild, moderate, marked, and extreme. Id. § 416.920(a)(c)(4). The last functional area is evaluated on a similar scale with the following degrees: none, one, two, three, four, or more. Id. If the ALJ determines an impairment only mildly affects the first three areas and does not affect the fourth, the impairment is generally found not severe unless evidence suggests the claimant is otherwise limited in his ability to perform basic work activities. Id. § 416.920(a)(d)(1).

The Court finds the ALJ did not reach inconsistent conclusions in determining Plaintiff's impairments were severe yet had little or no effect on the functional areas provided

by 20 C.F.R. § 416.920a(c)(3).  The language of 20 C.F.R. § 416.920a(d)(1) anticipates that instances may arise in which evidence indicates there is more than a minimal limitation on a claimant's ability to do basic work activities even though the claimant's impairments pose no more than mild effects on the four functional areas.  The section indicates, in those instances, it is appropriate to find the claimant's impairments are severe.  20 C.F.R. § 416.920a(d)(1).  Indeed, cases have arisen in which a claimant's mental impairments were determined to be severe even though they had less of an effect on the four functional areas than Plaintiff's depressive disorder does in the instant case.  See Stout v. Astrue, No. 3:07-cv-987-J-TEM, 2009 WL 890388 (M.D. Fla. Mar. 31, 2009) (ALJ found Plaintiff's mental impairments were severe even though there were no effects on the four functional areas aside from mild to moderate effects on concentration, persistence, and pace).  Although Plaintiff asserts the ALJ must articulate the rationale for his findings in this case and show he is not inadvertently presenting findings that are ordinarily in tension (Doc. 25-1, p. 3), Plaintiff offers no legal basis to support this claim and the Court is unable to locate any.  Accordingly, the Court finds the ALJ's conclusion that Plaintiff's mental impairments were severe was not inconsistent with his conclusion that they caused only mild functional limitations.

Additionally, the Court finds the ALJ's conclusions regarding the severity of Plaintiff's impairments are supported by substantial evidence.  The ALJ acknowledged evidence indicative of a limitation on the first two functional areas in noting that Plaintiff testified he does not stick to what he starts and cannot deal with crowds.  (Tr. 334).  However, the Court believes the conclusion that these limitations were no more than mild in nature was well supported by the claimant's testimony that he shops sometimes, has no problems with

16

personal care, has several girlfriends, and has friends but does not socialize regularly.  Also, the ALJ acknowledged evidence indicative of a limitation on the third functional area in referring to psychological evaluations which noted Plaintiff showed some difficulties with concentration, focus, and attention and problems attending, listening, and following what was asked of him.  Id.  However, the conclusion that this limitation was no more than mild in nature was well supported by indications that Plaintiff's short term memory was average and his long term memory was good.  Id.  The Court agrees with the ALJ that the record does not reflect any periods of decompensation for an extended time.

Plaintiff refers to other documents in asserting the ALJ's findings are not supported by substantial evidence.  (Doc. 22, p. 16-17).  For example, Plaintiff points to Dr. Guidera's statement that Plaintiff had "problems attending, listening, and following what [was] being asked of him," and Dr. Greenblum's statement that Plaintiff reported "feelings of hopelessness, suicidal ideation ... depressed mood, lack of energy, and anxiety."  Id.  Plaintiff asserts this evidence demonstrates his mental impairments cause more than mild functional limitations.[2]  Id.  However, the functional limitations posed by mental impairments cannot be measured with the same degree of certainty or exactness as variables such as height or weight.  Consequently, instances may arise in which evidence does not clearly favor one degree of limitation over another.  In these cases, support for a higher degree of limitation does not necessarily render a contrary finding unsupported by the evidence.

---

[2] Plaintiff also refers to a statement written by his mother, Robertha Lewis, and SSR 06-3p which states evidence provided by non-medical sources must be considered.  However, the ALJ indicated he considered the entire record in rendering his decision (Tr. 335), and the Court finds no indication the ALJ failed to consider this document.  Because the statement lacks probative value, the ALJ was not required to discuss it in his decision.

Under the substantial evidence standard of review, the Court considers only whether the

conclusions reached by the ALJ are supported by substantial evidence, not whether there is

substantial evidence supporting another conclusion which was not reached. See Adefemi v.

Ashcroft, 386 F.3d 1022, 1029 (11th Cir. 2004). Indeed, "findings of fact made by

administrative agencies ... may be reversed ... only when the record compels a reversal; the

mere fact that the record may support a contrary conclusion is not enough to justify a

reversal of the administrative findings." Mendez v. Astrue, No. 8:11-CV-686-T-33TGW,

2012 WL 1493732 (M.D. Fla. Mar. 21, 2012) report and recommendation adopted, 8:11-CV-

686-T-33TGW, 2012 WL 1481504 (M.D. Fla. Apr. 27, 2012) (quoting Adefemi, 386 F.3d at

1027). While the evidence cited by Plaintiff could support a finding that Plaintiff suffers from

more than mild functional limitations, it does not clearly render the ALJ's conclusions

erroneous or unsupported by substantial evidence. Accordingly, the Court cannot grant

reversal on this basis without exceeding its standard of review or substituting its findings of

fact for those of the Commissioner.

### 2. Whether the ALJ erred by not assigning left arm limitations

Plaintiff next argues the ALJ erred by not assigning left arm limitations despite

evidence that he sustained nerve damage and has limited use of his arm. (Doc. 22. p. 18).

Plaintiff contends the need for these limitations was supported by the opinions of several

medical sources. (Doc 22, p. 18-19). Specifically, Plaintiff points to Dr. Hate's opinion dated

December 18, 1997, Dr. Green's RFC assessment dated March 20, 2000, Dr.

Bergstresser's opinion dated March 20, 2000, and an evaluation from Community Medical

Clinic dated March 14, 2002. Id. The Commissioner responds by arguing the ALJ was not

required to consider this evidence as it predates Plaintiff's alleged onset date, by several

years in some instances.  (Doc 23, p. 15).  The Commissioner also points to Plaintiff's left

shoulder arthroscopy and argues substantial evidence supports the ALJ's conclusion that it

was successful in alleviating Plaintiff's left arm impairments.  Id.  (Doc 23, p. 16).  The Court

has reviewed the evidence of record and finds there is substantial evidence indicating

Plaintiff's left arm limitations were appropriately accounted for in limiting Plaintiff to light

work.[3]

Plaintiff is correct in noting the RFC assessment conducted by Dr. Green on

December 30, 1997 indicated Plaintiff was limited in his ability to push, pull, reach, handle,

finger, and feel with his left upper extremity.  (Tr. 195).  However, it bears noting that the

RFC assessment conducted on March 12, 1998 found Plaintiff was not limited in these

areas, with the exception that he could reach overhead only occasionally.  (Tr. 113).  The

1998 RFC also explicitly indicated Plaintiff was capable of performing light work with limited

overhead activity.  (Tr. 112, 115).  The findings of the 1998 assessment are bolstered by

those provided in the March 20, 2000 assessment, which indicated there were no

established limitations in Plaintiff's ability to reach, handle, finger, or feel.  (Tr. 135).  While

the 1997 assessment found Plaintiff was limited in his ability to push/pull with his upper

extremities, both of the later assessments found Plaintiff was either unlimited in this capacity

---

[3] Light work involves lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a
job is in this category when it requires a good deal of walking or standing, or when it involves
sitting most of the time with some pushing and pulling of arm or leg controls. To be considered
capable of performing a full or wide range of light work, you must have the ability to do
substantially all of these activities. If someone can do light work, we determine that he or she
can also do sedentary work, unless there are additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time.  20 C.F.R. § 404.1567

or could do so frequently.  (Tr. 111, 133, 193).  All of the RFC assessments agreed Plaintiff

was capable of lifting twenty pounds occasionally and ten pounds frequently.  (Tr. 111, 115,

193).

Additionally, Plaintiff is correct in noting the evaluation conducted by the Community

Medical Clinic on March 14, 2002 indicated Plaintiff's grip strength was assessed at one or

two out of five.  (Tr. 226, 236).  While this finding is particularly indicative of serious left arm

impairments, it is not consistent with the weight of evidence regarding Plaintiff's grip

strength.  For example, the Community Medical Center examined Plaintiff's grip strength

again on August 5, 2002, and assessed it at four out of five.  (Tr. 229).  Moreover, Dr.

Bergstressor's March 20, 2000 evaluation assessed Plaintiff's grip strength at five out of five

and assessed elevation/lowering in his left arm at four out of five.  (Tr. 227).  As indicated

above, the RFC reviews conducted in 1998 and 2000 also indicated Plaintiff was not limited

in handling (gross manipulation) or fingering (fine manipulation).  (Tr.113, 135).

Overall, the Court believes the weight of the evidence prior to Plaintiff's arthroscopy

suggests he was mildly impaired in his ability to reach and lift with his left arm due to his

history of knife wound.  Indeed, the portions of Dr. Bergstresser's opinion referenced by

Plaintiff indicated that his muscle atrophy resulted in a mild impairment from using flexion

and lifting with his left upper extremity.  (Tr. 227-228).  Further, while Plaintiff is correct in

noting Dr. Hate's opinion stated Plaintiff was limited in the use of his left arm (Tr. 191), the

document goes on to state "Plaintiff's ability to work would depend on the outcome of

surgical treatment of his left knee."  Id.  The Court understands this statement to indicate

that Plaintiff's ability to work was more contingent on the successful resolution of his left

knee difficulties than the resolution of his left arm difficulties.

During physical therapy following Plaintiff's left arm arthroscopy, Dr. Hanna administered a Physical Operational Therapy Evaluation dated August 20, 2010.  The evaluation indicated Plaintiff was unable to lift with his left upper extremity and was unable to reach over shoulder level or behind his back prior to therapy.  (Tr. 439).  The evaluation further provided that Plaintiff was unable to use his left arm to carry garbage, lift a garbage lid, pour a gallon of milk, or pour a coffee pot.  (Tr. 440).  However, the Plaintiff's Plan of Care stated that, over the course of his four week treatment, Plaintiff was expected to increase range of motion to 140 degrees so that he would be able to reach overhead without limitation and increase left hand strength so that he would be able to carry twenty pounds with his left hand and take out garbage.  (Tr. 438).  The Evaluation Plan also aspired to allow Plaintiff to successfully perform production line job duties and indicated Plaintiff had good "Rehab Potential."  The Court believes this document suggests Plaintiff was expected to be capable of performing the full range of light work at the conclusion of his physical therapy.

The Court finds there is substantial evidence supporting the ALJ's conclusion that Plaintiff's left arm athroscopy and physical therapy succeeded in rendering Plaintiff able to perform the full range of light work.  A post-operative examination on September 8, 2010 stated Plaintiff noticed improvement in his left shoulder pain, range of motion, and strength following the procedure.  (Tr. 401).  Indeed, Plaintiff exhibited a full active and passive range of motion in his left shoulder.  Id.  Consequently, the 1997 RFC review's finding that Plaintiff had no use of his left arm (Tr. 193, 195) does not appear to accurately describe Plaintiff's current functional capacity.  Because the 1998 RFC provided Plaintiff was capable of performing light work with a limitation on overhead activity (Tr. 112), the Court agrees with

21

the ALJ that this assessment indicates Plaintiff can now perform the full range of light work with his restored range of motion.  Of course, the 2000 RFC also supports this conclusion as it never acknowledged any manipulative limitations even before Plaintiff's treatment.  (Tr. 135).  Further, the record does not show Plaintiff has complained of difficulty with his left arm or sought treatment for his left arm since the post-operative examination.  Indeed, Plaintiff went on to receive left knee arthroscopy (Tr. 399), suggesting he was satisfied with the success of the left arm procedure.  Accordingly, the Court finds the ALJ appropriately accounted for Plaintiff's left arm impairments in restricting him to light work and was not required to assign additional left arm limitations.

### 3.  Whether the ALJ erred in failing to obtain the testimony of a vocational expert

Finally, Plaintiff argues the ALJ erred in mechanically applying the grids instead of obtaining the testimony of a vocational expert.  (Doc. 22, p. 19).  Plaintiff asserts the testimony of a vocational expert was required in this case because Plaintiff's left arm impairments and limitation to low stress work significantly reduced the range of light work he was able to perform.  (Doc. 22, pp. 19-22).  The Commissioner responds by arguing the testimony of a vocational expert was not necessary here because substantial evidence supports the ALJ's finding that Plaintiff's left arm injuries did not hinder his ability to perform light work.  (Doc. 23, pp. 18-19).  The Commissioner also asserts the ALJ explicitly found Plaintiff's limitation to low stress work had little or no effect on his occupational base for light work, and low stress is entailed in the definition of unskilled work.

Because the ALJ found Plaintiff could not return to his past relevant work, the burden of proof shifted to the Commissioner to establish Plaintiff could perform other work in the

national economy.  Foote, 67 F.3d at 1558.  The Eleventh Circuit has determined that to

satisfy this burden, an ALJ may:

> use the grids to determine whether other jobs exist in the national
> economy that a claimant is able to perform.  However, [e]xclusive
> reliance on the grids is not appropriate either when [the] claimant
> is unable to perform a full range of work at a given residual level or
> when a claimant has non-exertional impairments that significantly
> limit basic work skills.

Phillips v. Barnhart, 357 F.3d 1232, 1242 (11th Cir. 2004) (internal quotes and citations

omitted).  The first inquiry, whether a claimant is able to perform a full range of work at a

given residual functional level, only applies to exertional limitations.  Brown v. Astrue, No.

CV608-036, 2009 WL 2135005, at *4 (S.D. Ga. July 15, 2009).  With respect to non-

exertional limitations, the Eleventh Circuit has interpreted "significantly limit basic work skills"

to mean "limitations that prohibit a claimant from performing 'a wide range' of work at a

given work level."  Phillips, 357 F.3d at 1243.  This includes both the exertional levels

(sedentary, light, medium, heavy, and very heavy) as well as the non-exertional levels

(unskilled, semi-skilled, and skilled).  Brown, 2009 WL 215005, at *4.

Because the Court finds substantial evidence supports the ALJ's conclusion that

Plaintiff's left arm impairments did not prevent him from performing the full range of light

work, it concludes that vocational expert testimony was not required to address the left arm

limitations.  The Court must now consider whether Plaintiff's depressive disorder

necessitated vocational expert testimony.

The fifth step of the sequential process does not require the ALJ to include the

limitations posed by a claimant's mental impairments on the four functional areas.  See

Johnson v. Astrue, No. 3:09-cv-492-J-JRK, 2010 WL 3894098 (M.D. Fla. Sept. 30, 2010)

(citing SSR 96–8p, 1996 WL 374184, at *4).  Rather, this step requires the ALJ to include a translation of these limitations into practical, work-related functions.  Id.  The ALJ provided such a translation in limiting Plaintiff to low stress work.  Courts have previously found that limiting a claimant to low stress work sufficiently accounts for mild limitations on the four functional areas.  Cannon v. Astrue, No. 3:10-cv-243-J-TEM, 2011 WL 4346566 (M.D. Fla. Sept. 16, 2011) (citing Baker v. Astrue, No. 5:09–cv480–FtM–SPC, 2011 WL 611663 (M.D. Fla. Feb.11, 2011); Johnson, 2010 WL 3894098; and Stout, 2009 WL 890388).  Accordingly, the ALJ was required to obtain VE testimony only if Plaintiff's limitation to low stress employment significantly reduced his range of unskilled light work.

This Court has previously held that a limitation to low stress work is not contained within the definition of unskilled work.  Miller v. Astrue, No. 3:10-CV-355-MCR, 2011 WL 3897963 (M.D. Fla. Sept. 6, 2011).  In such a case, an ALJ cannot support his findings on the grids' administrative notice of unskilled jobs at an exertional level alone, but must make an explicit determination regarding the effect of that limitation on the claimant's range of employment.  See Vuxta v. Commissioner of Social Sec., 194 F. App'x 874, 878 (11th Cir. 2006) (providing that a disability determination relying exclusively on the grids would be appropriate if the ALJ determined a claimant's limitation to repetitive tasks did not preclude the claimant from performing a wide range of work at a given level).  In the instant case, the ALJ provided:

> If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.17.  However, the additional limitations have little or no effect on the occupational base of unskilled light work.  A finding of "not disabled" is therefore appropriate under the framework of this rule.  The

> claimant's mental impairment does not significantly erode the occupational base of unskilled work because he does not have a substantial loss in the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes while in a routine work setting on a sustained basis over a normal 8-hour workday (Social Security Ruling 85-15).

(Tr. 339). Accordingly, the Court finds the ALJ did not fail to reach an explicit finding regarding the effect of Plaintiff's restriction to low stress work on his occupational base and his reliance on the grids was appropriate.

## IV.   CONCLUSION

For the foregoing reasons, the Commissioner's decision is hereby **AFFIRMED**. The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this __8th__ day of August, 2012.


MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:
Counsel of Record